UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
*ex rel.* MICHAEL ROSE;

STATE OF ALASKA
*ex rel.* MICHAEL ROSE;

STATE OF CALIFORNIA
*ex rel.* MICHAEL ROSE;

STATE OF COLORADO
*ex rel.* MICHAEL ROSE;

STATE OF CONNECTICUT
*ex rel.* MICHAEL ROSE;

STATE OF DELAWARE
*ex rel.* MICHAEL ROSE;

DISTRICT OF COLUMBIA
*ex rel.* MICHAEL ROSE;

STATE OF FLORIDA
*ex rel.*   MICHAEL ROSE;

STATE OF GEORGIA
*ex rel.* MICHAEL ROSE;

STATE OF HAWAII
*ex rel.* MICHAEL ROSE;

STATE OF ILLINOIS
*ex rel.* MICHAEL ROSE;

STATE OF INDIANA
 *ex rel.* MICHAEL ROSE;

STATE OF IOWA
*ex rel.* MICHAEL ROSE;

STATE OF LOUISIANA
*ex rel.* MICHAEL ROSE;

STATE OF MARYLAND

**COMPLAINT**

**CIVIL ACTION No:** _____

**FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)**

**JURY TRIAL DEMANDED**

1

*ex rel*. MICHAEL ROSE;

STATE OF MASSACHUSETTS
*ex rel.* MICHAEL ROSE;

STATE OF MICHIGAN
*ex rel.* MICHAEL ROSE;

STATE OF MINNESOTA
*ex rel.* MICHAEL ROSE;

STATE OF MONTANA
*ex rel.* MICHAEL ROSE;

STATE OF NEVADA
*ex rel.* MICHAEL ROSE;

STATE OF NEW JERSEY
*ex rel.* MICHAEL ROSE;

STATE OF NEW MEXICO
*ex rel.* MICHAEL ROSE;

STATE OF NEW YORK
*ex rel.* MICHAEL ROSE;

STATE OF NORTH CAROLINA
*ex rel.* MICHAEL ROSE;

STATE OF OKLAHOMA
*ex rel.* MICHAEL ROSE;

STATE OF RHODE ISLAND
*ex rel.* MICHAEL ROSE;

STATE OF TENNESSEE
*ex rel.* MICHAEL ROSE;

STATE OF TEXAS
*ex rel.* MICHAEL ROSE;

STATE OF VERMONT
*ex rel.* MICHAEL ROSE;

STATE OF VIRGINIA
*ex rel.* MICHAEL ROSE;

STATE OF WASHINGTON
*ex rel.* MICHAEL ROSE;

STATE OF WISCONSIN
*ex rel.* MICHAEL ROSE;

                Plaintiff,

    v.

INTUITIVE SURGICAL, INC

                Defendant.

## INTRODUCTION

1.      This lawsuit involves a scheme by Defendant Intuitive Surgical, Inc. ("Intuitive"), the self-professed "global technology leader in robotic-assisted surgery,"[1] to pay kickbacks to surgeons to induce them to perform surgeries using Intuitive's *da Vinci* Surgical System (the "*da Vinci* System")—expensive and controversial robotic surgical equipment that Intuitive aggressively markets and distributes in the United States.

2.      To push its sales of this *da Vinci* System equipment, which costs millions of dollars to purchase and hundreds of thousands of dollars each year to maintain, Intuitive engaged in a highly aggressive campaign to encourage more hospitals and doctors to use the *da Vinci* System. Primarily, Intuitive developed what it referred to as its "Surgeon Locator," which it pitched to surgeons as "a powerful tool for marketing your practice" and a resource that would allow them to increase their profits by attracting additional surgery patients (to whom Intuitive also aggressively marketed the *da Vinci* System).

---

[1] http://investor.intuitivesurgical.com/phoenix.zhtml?c=122359&p=irol-newsArticle&ID=803280

3.      The catch for surgeons, however, was that they could not get listed on Intuitive's Surgeon Locator—and realize the significant financial benefit Intuitive promised would follow—unless they first completed at least twenty surgeries using the *da Vinci* System.

4.      And to remain on the Surgeon Locator, the surgeons had to continue performing at least twenty surgeries per year using the *da Vinci* System. This twenty surgery requirement is independent of any training or credentialing requirements. Before a surgeon even completes his or her first surgery using a *da Vinci* System, they must complete the required training and credentialing requirements. And even the most experienced surgeon with years of experience using the *da Vinci* System will be removed from the Surgeon Locator if he or she fails to complete at least twenty surgeries in a year. In fact, in some of the lawsuits pending against Intuitive, some plaintiffs allege that Intuitive lobbies hospitals to ease their credentialing requirements for using the *da Vinci* System to allow more doctors to use the machines.

5.      The primary purpose of Intuitive's scheme was not to improve surgeon competency using the *da Vinci* System—training and credentialing requirements were entirely independent of the Surgeon Locator and governed by individual hospital regulations. Nor was the purpose to ensure that patients had access to full information about which surgeons performed surgeries using the *da Vinci* System. If that had been the purpose then all surgeons who were qualified to perform surgeries on the *da Vinci* System would have been placed on the Surgeon Locator. Rather, Intuitive's primary purpose in offering surgeons the "powerful" marketing tool of inclusion on the Surgeon Locator was as a kickback for their performance of at least 20 surgeries a year using the *da Vinci* System. In other words, Intuitive used its Surgeon Locator marketing program as a kickback to further its own financial interests  at the expense of patients who were misled by the Surgeon Locator (which did not disclose the arrangement with

the doctors listed) into selecting surgeons who would perform their surgeries using the *da Vinci* System, which increased the cost of such procedures.

6.      One ear, nose, and throat surgeon described the problem: "I can't tell you how many patients come in who say, 'I want robotic surgery with a laser' – and they'll find somebody to do that." Speaking of Intuitive, the surgeon explained: "Their direct-to-consumer marketing is just criminal. Their lack of training, in my opinion it borders on criminal."

7.      A significant number of the surgeries performed using the *da Vinci* System are reimbursed by Medicaid, Medicare, TRICARE, FEHBP, and other federal and state programs. In addition, Medicaid, Medicare, and other federal and state programs help subsidize the purchase of *da Vinci* Systems and their installation in certain critical access hospitals throughout the United States. For example, an April 19, 2014 article reported that "Memorial Hospital of Converse County last year purchased a $2 million da Vinci Surgical System" and that "Memorial said 40% of its cost will be reimbursed by Medicare as a capital expense because it is a critical-access hospital."

8.      As a result of this kickback scheme, Intuitive knowingly caused doctors and hospitals to submit hundreds of millions of dollars in false claims to publicly-funded health care programs for medical procedures that were performed using the more costly and risk-associated *da Vinci* System devices.

9.      *Qui Tam* Plaintiff Michael Rose ("Relator") worked for Intuitive as a Clinical Sales Representative from October 2009 to July 2011 and brings this civil action on behalf of and in the name of the United States of America ("United States") under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of and in the name of the State Plaintiffs under analogous *qui tam* provisions of their state false claims laws.

## JURISDICTION AND VENUE

10.     All Counts of this Complaint are civil actions by Relator, acting on behalf of and in the name of the United States and the State Plaintiffs, against Intuitive under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and analogous state false claims laws.

11.     This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a).

12.     This Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b). In addition, the Court has supplemental jurisdiction over the claims brought on behalf of the State Plaintiffs under 28 U.S.C. § 1367.

13.     The False Claims Act provides that an action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Defendant transacts business in this judicial district by, among other things, selling the *da Vinci* System in this judicial district, and marketing the *da Vinci* System to medical providers and patients, including Government health care beneficiaries, in this judicial district. A significant number of the surgeons listed on the Surgeon Locator are located in this judicial district. For example, a search for surgeons within 20 miles of New York City returned a list of 230 surgeons, many of whom are in this judicial district.

14.     Accordingly, this Court has personal jurisdiction over Intuitive, and venue is appropriate in this district. 31 U.S.C. § 3732(a). Venue also is proper under 28 U.S.C. § 1391.

15.     On information and belief, none of the allegations or transactions set forth in this Complaint are substantially the same as allegations or transactions that have been publicly disclosed in any federal criminal, civil, or administrative hearing in which the Government or its

agent is a party, or in a congressional, administrative or Government Accountability Office, or other federal report, hearing, audit or investigation, or from the news media.

16.     Relator Michael Rose has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Moreover, prior to filing this lawsuit and prior to any public disclosures regarding this matter, Relator voluntarily provided the information set forth herein to agents of the United States Department of Justice and, to the extent required, to the Attorneys General of the State Plaintiffs.

## THE PARTIES

### Relator Michael Rose

17.     Michael Rose obtained a Bachelor of Science in Biology and a minor in Business from the University of Wisconsin, Stevens Point, in 1990. Since 1996, he has worked in the area of medical sales, including sale of medical devices. During his long career, he has established a record of top performance. He has received multiple awards and repeated recognition for outstanding performance during his career. For example, he received the "President's Award" in 2007 while working as a Medical Sales Representative at DePuy Orthopedics.

18.     Relator was hired by Intuitive in October 2009 as a Clinical Sales Representative. He represented Intuitive's clinical and capital divisions in Montana and was responsible for the only *da Vinci* Cardiac program in Montana, Colorado, and Utah. While working at Intuitive, he increased case volumes by over 500%--ranking 4th out of 325 Clinical Sales Representatives in 2010. Mr. Rose was directly responsible for the sale of two *da Vinci* Systems and helped increase Montana's robotic programs from two to seven while training 27 surgeons.

19.     Relator ended his employment with Intuitive in July 2011.

20.     Relator currently resides in Deerfield Beach, Florida.

### Plaintiff United States Of America

21.     Relator Michael Rose brings this action on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

22.     On behalf of the United States, Relator seeks recovery for damages to federally funded health insurance programs, including but not limited to the federal-state Medicaid medical assistance program established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, and state law; Medicare Part A, 42 U.S.C. §§ 1395c *et seq.*; Medicare Part B, 42 U.S.C. §§ 1395j *et seq.*; the U.S. Department of Defense TRICARE and CHAMPUS health care programs, 10 U.S.C. §§ 1071 *et seq.*; and the Federal Employees Health Benefits Plan ("FEHBP"), 5 U.S.C. §§ 8901 *et seq.*

23.     The Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health & Human Services ("HHS") funds and oversees the joint federal-state funded Medicaid Program for the financially needy. The State Plaintiffs participate in the Medicaid program, under which they pay for health care costs in certain circumstances and for certain individuals who are beneficiaries of such programs. Such costs initially are paid by each state's Medicaid program agency, which, in turn, seeks reimbursement for a portion of its expenditures from the federal Government.

24.     CMS also funds and oversees the Medicare Part A and B programs, which covers a portion of medical expenditures for eligible individuals.

25.     The U.S. Department of Defense ("DOD") funds and oversees the CHAMPUS and TRICARE programs, which cover a portion of medical expenditures incurred by civilian DOD employees, retirees, and their families.

26.     The U.S. Office of Personnel Management ("OPM") funds and oversees the FEHBP, which covers a portion of health care expenditures incurred by federal Government employees, retirees, and their families.

### State Plaintiffs

27.     Relator brings this action on behalf of the States of Alaska, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin, as well as the District of Columbia (collectively, the "State Plaintiffs") under, respectively, the *qui tam* provisions of the following false claims laws: the Alaska Medical Assistance False Claim & Reporting Act, Alaska Stat. Ann. §§ 09-58-010 *et seq.*; the California False Claims Act, Cal. Gov. Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.4 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 *et seq.*, including as previously codified at Conn. Gen. Stat. §§ 17b-301b *et seq.*; the Delaware False Claims & Reporting Act, 6 Del. C. Ann. §§ 1201 *et seq.*; the District of Columbia Medicaid Fraud & Recovery Act, D.C. Code §§ 2-381.01 *et seq.*, including as previously codified at D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; the Georgia State False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the Hawaii False Claims Law, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*; the Indiana False Claims & Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Stat. Ann. §§ 46:437:1 *et seq.*; the Maryland False Health Claims Act, Md. Code Ann., Health-Gen.

§§ 2-601 *et seq.*; the Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mon. Code Anno. §§ 17-8-401 *et seq.*; the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law §§ 187 (McKinney) *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, 63 Okla. St. §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.*, and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; the Washington Health Care False Claim Act, Wash. Rev. Code Ann. §§ 48.80.010 *et seq.*, and Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. §§ 74.66.005 *et seq.*; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931 *et seq.*

28.     On behalf of the State Plaintiffs, Relator seeks recovery for damages caused by the submission of false claims to state-funded health insurance programs, including but not limited to: (1) the federal-state Medicaid programs that are jointly funded by the United States and the State Plaintiffs; and (2) other state health insurance programs that may cover costs of surgery and/or surgical devices.

**Defendant Intuitive Surgical, Inc.**

29.    Intuitive is a Delaware corporation with headquarters in Sunnyvale, California. It is the self-described "global leader in robotic-assisted minimally invasive surgery" and develops, manufactures, and markets the *da Vinci* Surgical System for a wide variety of surgical procedures. For example, in 2015, Intuitive reported revenues of approximately $2.4 billion—a 12% increase from its 2014 revenues of $2.1 billion. In 2016, Intuitive reported revenues of $2.7 billion—a 12.5% increase from its 2015 revenues.

30.    Intuitive attributed this revenue growth primarily to an increase in the number of *da Vinci* System procedures being performed. Intuitive markets the *da Vinci* System as providing surgeons with the capabilities of traditional open surgery while enabling them to operate through only a few small incisions in a manner similar to laparoscopic surgery. The *da Vinci* System is marketed and sold throughout the United States.

## STATUTORY BACKGROUND

### The Federal Health Care Program Anti-Kickback Statute

31.    The Federal Health Care Program Anti-Kickback Statute ("AKS"), enacted as Section 1128B(b) of the Social Security Act, prohibits persons from paying, soliciting, or receiving illegal remunerations "in return for ... arranging for or recommending purchasing, leasing or ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(B) and (2)(B); *see* 42 U.S.C. § 1320a-7a(a)(7). The statute specifically defines such illegal remuneration as including kickbacks and bribes, whether paid directly or indirectly, overtly or covertly, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1) and (2). The terms "good" and "item" as used in the statute include medical devices.

32.     Intuitive itself described the AKS as follows in its 2016 Form 10-K:

[T]he federal Anti-Kickback Statute, which prohibits, among other things, persons from knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual for, or the purchase, order or recommendation of, any good or service for which payment may be made under federal healthcare programs, such as the Medicare and Medicaid programs. A person or entity does not need to have actual knowledge of the federal Anti-Kickback Statute or specific intent to violate it to have committed a violation. In addition, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act;

...

The Medicare and Medicaid anti-kickback laws, and several similar state laws that may apply to items or services reimbursed by any third-party payor, including commercial insurers, prohibit payments or other remuneration that could be considered to induce hospitals, physicians or other potential purchasers of our products either to refer patients or to purchase, lease or order, or arrange for or recommend the purchase, lease or order, of healthcare products or services for which payment may be made under federal and state healthcare programs, such as Medicare and Medicaid and any other third-party payor programs. Further, the PPACA, among other things, amends the intent requirement of the federal anti-kickback and criminal health care fraud statutes.

A person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the PPACA provides that the government may assert that a claim including items or services resulting from a violation of the federal anti-kickback statute constitutes a false or fraudulent claim for purposes of the false claims statutes. Although we would not submit claims directly to government payors, manufacturers can be held liable under the federal false claim act if they are deemed to "cause" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information to customers or promoting a product off-label.

These laws may affect our sales, marketing, and other promotional activities by limiting the kinds of financial arrangements we may have with hospitals, physicians or other potential purchasers of our products. They particularly impact how we structure our sales offerings, including discount practices, customer support, education and training programs, physician consulting and other service arrangements. These laws are broadly written, and it is often difficult to determine precisely how these laws will be applied to specific circumstances. Violating anti-kickback laws can result in civil and criminal

penalties, which can be substantial and include exclusion from government healthcare programs for noncompliance. Even an unsuccessful challenge or investigation into our practices could cause adverse publicity, and be costly to defend, and thus could harm our business and results of operations.

33.    Federal regulations codified at 42 C.F.R. 1001.952(d) identify certain narrowly defined financial transactions (known as "safe harbors") that do not come within the prohibitions of the AKS. Persons or entities relying on the safe harbor exceptions to avoid liability under the AKS have the burden of affirmatively proving their strict compliance with all conditions set forth in the statutory exceptions. The violations of the AKS described in this Complaint do not fall within any of these "safe harbors."

34.    The AKS covers any arrangement in which at least one purpose of the remuneration is to induce another to recommend or arrange for the purchasing, leasing, or ordering of goods or items that will be paid for by a federal health program—even if other motivations are also present. The HHS Office of the Inspector General has stated that "provision of advertising assistance" can constitute remuneration. OIG Advisory Opinion No. 06-16, 2006 WL 6252287, at *3.

35.    The HHS Office of Inspector General also has identified several other characteristics of arrangements among sellers, sales agents, and purchasers that appear to be associated with an increased potential for program abuse, particularly overutilization and excessive program costs. These characteristics include the following, each of which is present in the *da Vinci* System scheme at issue in this complaint:

- Direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program;

- Direct contact between the sales agent and Federal health care program beneficiaries;

- Use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients; and

- Marketing of items or services that are separately reimbursable by a Federal health care program (e.g., items or services not bundled with other items or services covered by a DRG payment), whether on the basis of charges or costs.

Advisory Request No. 99-3; Advisory Request No. 98-10.

36.      Notably, in August 1994, the HHS Office of Inspector General issued a Special Fraud Alert, that was later published in the Federal Register, warning of certain aggressive marketing practices in which drug manufacturers made payments to pharmacies and physicians—warning that these practices would implicate the criminal anti-kickback statute if "one purpose of any of these marketing schemes is to induce the provision of a prescription drug item reimbursable by Medicaid. There is no statutory exception or 'safe harbor' to protect such activities." 94 Fed. Reg. 31,157 (Dec. 19, 1994).

37.      One of the three practices the HHS Office of Inspector General singled out for special mention was a "conversion" program in which a manufacturer made cash payments to pharmacies in exchange for the pharmacies persuading physicians to switch patients from a competitor's drug to the manufacturer's drug—a practice similar to the actions at issue in this complaint. The HHS Office of Inspector General pointed out the public safety concerns at issue:

> Traditionally, physicians and pharmacists have been trusted to provide treatments and recommend products in the best interest of the patient. In an era of aggressive drug marketing, however, patients may now be using prescription drug items, unaware that their physician or pharmacist is being compensated for promoting the selection of a specific product.

59 Fed. Reg. 65372. The same concerns are implicated by a medical device manufacturer compensating surgeons and hospitals for promoting particular surgical practices.

**Compliance as a Condition of Payment**

38.      Compliance with the AKS is a condition of payment for federally funded healthcare programs, including Medicare, Medicaid, FEHBP, and TRICARE, which means that, if there is a claim for services in violation of the AKS, the Government will not pay the claim.

39.      For example, federal law and regulations require that any health care provider who furnishes health care services that may be reimbursed under Medicare or Medicaid must ensure that, to the extent of his or her authority, those services are provided "only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 1004.10. This requirement makes the health care provider the "gatekeeper" who, through the exercise of his unbiased medical judgment, plays a critical role in determining what services will be reimbursed with federal funds. If the gatekeeper's medical judgment is corrupted—for example, by the receipt of kickbacks from a party who would benefit from the gatekeeper's decision to use that party's products in the course of patient care—then the federal health insurance system is at risk of paying for services that were not performed consistent with the physician's unbiased best medical judgment. The AKS was enacted to address this risk—a risk that goes beyond whether a decision can be justified as "medically necessary" and focuses on whether the health care provider's judgment may have been corrupted.

40.      The TRICARE program (also known as CHAMPUS), which is governed by regulations set forth at 32 CFR §§ 199 *et seq.*, includes a similar requirement. Section 199.9(c) describes conduct that would be considered "fraud" against the TRICARE program—stating in relevant part: "(12) Arrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the CHAMPUS through various means (such as commissions, feesplitting, and kickbacks) used to divert or conceal

improper or unnecessary costs or profits." The TRICARE program considers compliance with the AKS to be a condition of payment.

41.     In addition, hospitals and physicians enter into Provider Agreement with Centers for Medicare and Medicaid Services ("CMS") in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from federal health care programs, the provider must certify the following:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

42.     Thus, when a hospital submits a claim for payment, it does so subject to and under the terms of this certification to the United States that the services for which payment is sought were delivered in accordance with federal law, including the AKS.

43.     Likewise, when a physician submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, including the AKS.

44.     In order for hospitals and doctors to obtain reimbursement from Medicaid, state Medicaid programs require that the services provided must be in full compliance with applicable federal and state laws, including applicable. For example:

45.     As a pre-condition to receive payment, the State of California requires a provider to certify that it will:

> [C]omply with all applicable provisions of Chapters 7 and 8 of the
> Welfare and Institutions Code (commencing with Sections 14000 and
> 14200), and any applicable rules or regulations promulgated by DHCS
> pursuant to these Chapters. Provider further agrees that if it violates any of
> the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or
> any other regulations promulgated by DHCS pursuant to these Chapters, it
> may be subject to all sanctions or other remedies available to DHCS.
> Provider further agrees to comply with all federal laws and regulations
> governing and regulating Medicaid providers.

*E.g.*, Medi-Cal Provider Agreement (available at http://files.medi-cal.ca.gov/pubsdoco/

Publications/masters-other/provappsenroll/02enrollment_DHCS6208.pdf (last accessed June 23,

2017)).

46.    As a pre-condition to receive payment, the State of Colorado requires a provider

to certify it will:

> [C]omply with all applicable provisions of the Social Security Act, as
> amended; federal or state laws, regulations, and guidelines; and
> Department rules. Provider shall limit the use or disclosure of
> information/data concerning Colorado Medical Assistance Program clients
> to the purposes directly connected with the administration of the Colorado
> Medical Assistance Program.

*E.g.*, Colorado Medical Assistance Program Standard Provider Application (available at

https://www.colorado.gov/pacific/sites/default/files/Rebrand%20Standard%20App%2002262015

%20(July%202013d)_1.pdf (last accessed June 23, 2017)).

47.    As a pre-condition to receive payment, the State of Connecticut requires a

provider to certify it will:

> [A]bide by and comply with all federal and state statutes, regulations, and
> policies pertaining to Provider's participation in the Connecticut Medical
> Assistance Program, as they may be amended from time to time.

*E.g.*, Connecticut Provider Enrollment Agreement (available at http://www.ct.gov/

dss/lib/dss/pdfs/provider_enrollment_agreement.pdf (last accessed June 23, 2017)).

48.     As a pre-condition to receive payment, the State of Delaware requires a provider

to certify that:

> [A]ll services for which reimbursement will be claimed shall be provided
> in accordance with all federal and state laws pertaining to the Delaware
> Medical Assistance Program, and that all charges submitted shall not
> exceed the Provider's usual and customary charges for the same services
> and items provided to persons not entitled to receive benefits under the
> Delaware Medical Assistance Program.

*E.g.*, Delaware Title XIX Electronics Claim Submission Provider Agreement (available at

https://www.availity.com/documents/hew/DEMCD_P_MEDICAID_DE_Claims.pdf           (last

accessed June 25, 2017)). The State of Delaware also requires a provider to certify that:

> [A]ny payments made in satisfaction of claims submitted electronically
> will be delivered from federal and state funds and that any false claims,
> statements or documents, or concealments of a material fact may be
> subject to prosecution under federal and state law.

*Id.*

49.     As a pre-condition to receive payment, the District of Columbia requires a

provider to certify that it will "comply with applicable Federal and District standards for

participation in Title XIX of the Social Security Act." *E.g.*, Department of Health Care Finance

Provider/Supplier    Enrollment    Application    (available    at    https://www.dc-

medicaid.com/dcwebportal/documentInformation/getDocument/ 15275 (last accessed June 23,

2017)).

50.     As a pre-condition to receive payment, the State of Florida requires a provider to

certify it will:

> [C]omply fully with all state and federal laws, rules, regulations, and
> statements of policy applicable to the Medicaid program, including the
> Medicaid Provider Handbooks issued by the agency, as well as all federal,
> state, and local laws pertaining to licensure, if required, and the practice of
> any of the healing arts.

*E.g.*, Florida Medicaid Provider Agreement (available at https://ahca.myflorida.com/ Medicaid/QHPE/docs/MPA_Inst_QH_Dec_13.pdf (last accessed June 23, 2017)).

51.   As a pre-condition to receive payment, the State of Georgia requires a provider to certify it will:

> [C]omply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II and the applicable Part III manuals. The term "Provider" shall include those persons or entities performing services under the supervision or other direction of Provider, and all acts or omissions of such persons or entities shall be attributed to Provider.

*E.g.*, Georgia Statement of Participation (available at https://www.mmis.georgia.gov/ portal/Portals/0/StaticContent/Public/ENG/ENROLLMENT/Stmt_of_Participation%2013-02-2012%20212352.pdf (last accessed June 23, 2017)).

52.   As a pre-condition to receive payment, the State of Hawaii requires a provider to certify that:

> Services are performed in accordance with Federal and State Medicaid laws, rules and policies and that any false claim, statements, documents or concealment of a material fact(s) may be prosecuted under applicable Federal or State laws.

*E.g.*, Hawaii Medicaid Provider Manual Provider Requirements, Chapter 2 (available at http://www.med-quest.us/PDFs/Provider%20Manual/PMChp0211.pdf (last accessed June 23, 2017)).

53.   As a pre-condition to receive payment, the State of Illinois requires a provider to certify:

> As a participating provider in the Program, the Provider agrees, on a continuing basis, to comply with all applicable Federal, State and Department laws, regulations, rules, requirements, policies and procedures, including but not limited to the Federal Social Security Act, Titles XI, XVIII, XIX and XXI; the Illinois Public Aid Code at 305 ILCS

19

> 5/ et seq.; the Illinois Administrative Code, Title 89, Parts 104 and 140;
> and Program provider handbooks, policies and requirements, as currently
> in effect and as amended.

*E.g.*, Agreement for Participation in the Illinois Medical Assistance Program (available at

http://www.hfs.illinois.gov/assets/hfs1413.pdf (last accessed June 12, 2017)).

54. As a pre-condition to receive payment, the State of Indiana requires a

provider to certify that it will "comply with all federal and state statutes and regulations

pertaining to the Medicaid Program or CHIP, as they may be amended from time to time."

*E.g.*, Indiana Health Coverage Programs Provider Agreement (available at

http://www.indianamedicaid.com/ihcp/ProviderServices/pdf/ ProviderAgreement.pdf (last

accessed June 23, 2017)).

55. As a pre-condition to receive payment, the State of Iowa requires a provider to

certify that it will:

> Comply with all applicable Federal and State laws, administrative rules
> and written policies of the Iowa Medicaid program, including but not
> limited to Title XIX of the Social Security Act (as amended), the Code of
> Federal Regulations, the Federal anti-kickback statute and the Stark law,
> the provisions of the Code of Iowa and administrative rules of the Iowa
> Department of Human Services and written Department policies,
> including but not limited to, policies contained in the Iowa Medicaid
> Provider Manual, and the terms of this Agreement.

*E.g.*, Iowa Medicaid Provider Agreement General Terms (available at

https://dhs.iowa.gov/sites/default/files/470-2965_1.pdf (last accessed June 12, 2017));

56. As a pre-condition to receive payment, the State of Louisiana requires a provider

to certify:

> The provider understands that it is a violation if they fail to comply with
> any or all federal or state laws, regulations, policies, rules, criteria, or
> procedures, applicable to the Medical Assistance Program or a program of
> the Medical Assistance Program in which the provider, provider-in-fact,
> agent of the provider, billing agent, affiliate or other person is

participating (Louisiana Administrative Code Title 50, Subpart 5, Chapter 41, Subchapter A, §4147.

*E.g.*, Enrollment Packet for the Louisiana Medical Assistance Program (available at http://www.lamedicaid.com/provweb1/Provider_Enrollment/Enrollment_Entities.pdf (last accessed June 23, 2017)). It also requires a provider to certify:

> As a condition of payment for goods, services and supplies provided to recipients of the Medicaid Program, providers and entities must comply with the False Claims Act employee training and policy requirements in 1902(a)(68) of the Social Security Act, set forth in that subsection and as the Secretary of the United States DHHS may specify. As an enrolled provider/entity, the provider understands that it is their obligation to inform all of their employees and affiliates of the provisions of the Federal False Claims Act, and any Louisiana laws and/or rules pertaining to civil or criminal penalties for false claims and statements, and whistleblower protections under such laws and/or rules. When monitored or audited, the provider will be required to show evidence of compliance with this requirement.

*Id.* Further, it requires a provider to certify:

> The provider understands that payment and satisfaction of any claims will be from Federal and State Funds; and any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws.

57.    As a pre-condition to receive payment, the State of Maryland requires a provider to certify it will:

> [C]omply with all standards of practice, professional standards and levels of Service as set forth in all applicable federal and state laws, statues, rules and regulations, as well as all administrative policies, procedures, transmittals, and guidelines issued by the Department, including but not limited to, verifying Recipient eligibility, obtaining prior authorizations, submitting accurate, complete and timely claims, and conducting business in such a way the Recipient retains freedom of choice of providers.

*E.g.*, Provider Agreement for Participation in Maryland Medical Assistance Program (available at http://www.lamedicaid.com/provweb1/Provider_Enrollment/Enrollment_Entities.pdf (last accessed June 23, 2017)).

21

58.     As a pre-condition to receive payment, the State of Massachusetts requires a provider to certify it will "comply with all federal and state laws, regulations, and rules applicable to the Provider's participation in MassHealth, now existing or adopted during the term of this Provider Contract." *E.g.*, Massachusetts Provider Contract for Entities (available at http://www.mass.gov/eohhs/docs/masshealth/provider-services/forms/gen-16.pdf (last accessed June 23, 2017)).

59.     As a pre-condition to receive payment, the State of Michigan requires a provider to agree not to receive "kickbacks"—identifying such as an "[e]xample[] of Medicaid fraud":

> Receiving Kickbacks: An ancillary provider (e.g., physical therapist, laboratory, pharmacy) may agree to pay a physician, nursing facility, or hospital administrator or owner a portion of his Medicaid reimbursement for services rendered to the physician's patient or a beneficiary residing in the facility. Payments to a physician or facility administrator or owner may be a cash payment, a vacation trip, a leased vehicle, inflated rental for space, etc. Often a kickback arrangement results in unnecessary tests or services being provided to the beneficiary in order to generate additional reimbursement.

*E.g.*, Michigan Department of Health and Human Services, Medicaid Provider Manual (available                                                                                             at http://www.lamedicaid.com/provweb1/Provider_Enrollment/Enrollment_Entities.pdf (last accessed June 23, 2017)). Michigan further requires providers to acknowledge that, under its Medicaid False Claim Act (MCLA 400.601 et. seq.):

> An individual, whether a provider, an employee, or an accomplice, convicted of such an activity is subject to a fine of up to $50,000 and a prison sentence of four to ten years for each count, as well as full restitution to Medicaid of all funds fraudulently obtained. The provider may be suspended from participating in Medicaid for a period of time and, in some instances, his license to practice his profession may be suspended or revoked.

*Id.*

60.     As a pre-condition to receive payment, the State of Minnesota requires a provider to certify it will:

> Comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services.

*E.g.*,   Minnesota   Health   Care   Programs   Provider   Agreement   (available   at https://edocs.dhs.state.mn.us/lfserver/Public/DHS-4138-ENG (last accessed June 23, 2017)).

61.     As a pre-condition to receive payment, the State of Montana requires a provider to certify it will:

> [C]omply with all applicable laws, rules and written policies pertaining to the Montana Medicaid Program (Medicaid), including but not limited to Title XIX of the Social Security Act, the Code of Federal Regulations (CFR), Montana Codes Annotated (MCA), Administrative Rules of Montana (ARM) and written Department of Public Health and Human Services (Department) policies, including but not limited to policies contained in the Medicaid provider manuals, and the terms of this document.

*E.g.*, Montana Health Care Programs and MHSP Provider Enrollment Agreement and Signature Page   (available   at   http://medicaidprovider.mt.gov/Portals/68/docs/enrollment/ paperenrollmentpackageall.pdf (last accessed June 23, 2017)).

62.     As a pre-condition to receive payment, the State of Nevada requires a provider to certify it will:

> [A]dhere to standards of practice, professional standards and levels of Service as set forth in all applicable local, state and federal laws, statues, rules and regulations as well as administrative policies and procedures set forth by the Division relating to the Provider's performance under this Contract.

*E.g.*,   Nevada   Provider   Enrollment   Application   (available   at https://www.medicaid.nv.gov/Downloads/provider/NV_provider_enrollment_packet.pdf   (last accessed June 23, 2017)).

63.     As a pre-condition to receive payment, the State of New Jersey requires a provider to certify it will:

> [C]omply with all applicable State and Federal laws, policies, rules and regulations promulgated pursuant thereto.

*E.g.,*     New     Jersey     Provider     Agreement     (available     at http://www.nj.gov/dcf/providers/csc/Provider%20Agreement%20FD%2060.doc. (last accessed June 23, 2017)).

64.     As a pre-condition to receive payment, the State of New Mexico requires a provider to certify it will:

> [C]omply with all applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines; and HSD rules. Provider will limit the use or disclosure of information/data concerning State of New Mexico's Medicaid Program clients to the purposes directly connected with the administration of the State of New Mexico's Medicaid Program.

*E.g.,* State of New Mexico Medicaid Program, Provider Participation Agreement (available at https://nmmedicaid.acs-inc.com/static/Docs/EDI%20Provider%20Trading%20Partner%20Agreement.docx (last accessed June 23, 2017)).

65.     As a pre-condition to receive payment, the State of New York requires a provider to certify it will:

> [A]bide by all applicable Federal and State laws as well as the rules and regulations of other New York State agencies particular to the type of program covered by this enrollment application.

*E.g.,*     New     York     State     Medicaid     Enrollment     Form     (available     at https://www.emedny.org/info/providerenrollment/ProviderMaintForms/436601_INST_FORM_InstRateBasedEnrlForm.pdf (last accessed June 23, 2017)).

66.     As a pre-condition to receive payment, the State of North Carolina requires a provider to certify:

> [T]hat all claims made for Medicaid payment shall be true, accurate, and complete and that services billed to the Medicaid Program shall be personally furnished by me, my employees, or persons with whom I have contracted to render services, under my personal direction.
>
> I understand that payment of claims will be from federal, state and local tax funds and any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal and State laws and I may be fined or imprisoned as provided by law.

*E.g.*, North Carolina Division of Medical Assistance Provider Certification (available at https://www2.ncdhhs.gov/DMA/hospital/8.pdf (last accessed June 23, 2017)).

67.     As a pre-condition to receive payment, the State of Oklahoma requires a provider to agree to "comply with all applicable statutes, regulations, policies, and properly promulgated rules of OHCA [the Oklahoma Health Care Authority]." *E.g.*, Oklahoma SoonerCare General Provider Agreement (available at https://www.ohcaprovider.com/Enrollment/Prod/LegalDocs/General_Agreement_2014-1.pdf (last accessed June 23, 2017)).

68.     As a pre-condition to receive payment, the State of Rhode Island requires a provider to certify:

> The Provider acknowledges it is subject to and will follow all applicable Federal and RI General laws, EOHHS rules, applicable State and Federal regulations, the False Claims Act, Title XIX of the Social Security Act, the American with Disabilities Act, EOHHS policies and amendments, official policy as transmitted to the provider in the applicable EOHHS provider manuals, provider bulletins, reference guides, transmittal letters or "updates" as well as certification standards that govern the specific Medicaid waiver service or govern the Rhode Island Medicaid Program in accordance with requirements of the Federal Government and the State of Rhode Island and any amendments to any of these authorities thereto (hereafter collectively referred to as "legal authorities"). Suspected violations must be reported by the Provider to EOHHS, its fiscal agent, or the Medicaid Fraud Control Unit of the Rhode Island Department of Attorney General (MFCU). The provider acknowledges that it is

> responsible for knowing the applicable provisions of federal and state laws, regulations, the Medicaid waiver requirements, and policies that apply to the provided services and for complying with all as a condition of participation as a provider in the RI Medicaid program. Provider may be held liable for any violation of these rules, regulations or policies including suspension and/or termination from the RI Medicaid program. Provider acknowledges that administrative, civil, or criminal action may be initiated if the Provider is found in violation of the legal authorities. It is the responsibility of the provider to be familiar with the legal authorities.

*E.g.*, State of Rhode Island Executive Office of Health and Human Services Provider Agreement Form (available at http://www.eohhs.ri.gov/Portals/0/Uploads/Documents/prov_agreement.pdf (last accessed June 23, 2017)).

69.     As a pre-condition to receive payment, the State of Tennessee requires a provider to certify:

> Provider or Provider Entity understands that payment by TennCare is conditioned upon the invoice, claim or bill and the underlying transaction complying with Medicaid laws, regulations, and program instructions including but not limited to, the Federal anti-kickback statute, the Stark law and federal requirements on disclosure, debarment and exclusion screening, and is conditioned on Provider or Provider Entity compliance with all applicable conditions of participation in Medicaid.

*E.g.*, Tennessee Provider Payment and Participation Agreement (available at https://pdms.tenncare.tn.gov/Documents/Provider%20Participation%20Agreement.pdf (last accessed June 25, 2017)).

70.     As a pre-condition to receive payment, the State of Texas requires a provider to certify:

> Provider agrees to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act. The Medicaid laws, regulations, and program instructions are available through the Medicaid contractor. Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the

Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicaid.

*E.g.*,  Texas   HHSC   Medicaid   Provider   Agreement   (available   at http://www.tmhp.com/Provider_Forms/Provider%20Enrollment/F00110_HHSC%20Medicaid%20Provider%20Agreement.pdf (last accessed June 23, 2017)).

71.     As a pre-condition to receive payment, the State of Virginia requires a provider to certify it will "comply with all applicable state and federal laws, as well as administrative policies and procedures of VMAP as from time to time amended." *E.g.*, Virginia Medical Assistance   Program   Group   Participation   Agreement   (available   at https://www.virginiamedicaid.dmas.virginia.gov/wps/PA_VAProviderServices/VAPdfRenderServlet?selectedCode=A66 (last accessed June 23, 2017)).

72.     As a pre-condition to receive payment, the State of Washington requires a provider to certify its agreement that:

> The medical assistance and medical care programs are authorized and governed by Title XIX of the Social Security Act, Title XXI of the Social Security Act, Chapter IV of Title 42 of the Code of Federal Regulations (CFR), Chapter 74.09 of the Revised Code of Washington (RCW), and Titles 182 and 388 of the Washington Administrative Code (WAC). The Provider is subject to and shall comply with all federal and state laws, rules, and regulations and all program policy provisions, including Pre-2012 Numbered Memoranda, Provider Notices, Medicaid Provider Guides, and other associated written HCA issuances in effect at the time the service is rendered, which are incorporated into this Agreement by this reference.

*E.g.*, Washington State Health Care Authority Core Provider Agreement (available at https://www.hca.wa.gov/assets/billers-and-providers/core-provider-agreement.pdf (last accessed June 23, 2017)).

73.     As a pre-condition to receive payment, the State of Wisconsin requires a provider to certify its agreement "[t]o comply with all other applicable federal and state laws, regulations

and policies … under Wisconsin's Medicaid program." *E.g.*, Wisconsin Medicaid Program Provider Agreement and Acknowledgement of Terms of Participation (available at https://dhs.wisconsin.gov/forms/F0/f00180b.doc. (last accessed June 23, 2017)).

74.    During the time period covered herein, the remaining states also have conditioned Medicaid payment on providers certifying compliance with antikickback law or all "applicable" law, which necessarily includes the AKS and, in the case of some states, also includes state anti-kickback statutes made specifically applicable to Medicaid providers.

## THE KICKBACK SCHEME

75.    The *da Vinci* System was approved by the FDA for general laparoscopic surgery in 2000. It is expensive—costing $1.3 million to $2.3 million to purchase. Intuitive also earns additional revenue from service contracts and replacement parts.[2] Surgeries performed using the *da Vinci* System also are several thousand dollars more expensive than traditional open or even minimally invasive laparoscopic surgery. Further, the medical benefits of using the *da Vinci* System in lieu of more traditional open or laparoscopic surgeries still are unconfirmed.[3]

76.    Because Intuitive's revenue growth depends on growth in the number of surgeries performed on the *da Vinci* System, Intuitive has engaged in an aggressive multi-prong marketing scheme targeted at hospitals, individual doctors, and patients ("direct-to-consumer").

77.    As a result of Intuitive's significant direct-to-consumer marketing, patients are important drivers of the decision whether to have surgery using the *da Vinci* System. In addition, because the *da Vinci* System is so expensive, hospitals also market surgeries using the *da Vinci* System in order to recoup the costs of the machine. The effect of this is to *further* increase

---

[2] http://www.nytimes.com/2008/05/04/business/04moll.html
[3] http://www.healthline.com/health-news/is-da-vinci-robotic-surgery-revolution-or-ripoff-021215#2

patient perception that the surgery using the *da Vinci* System leads to better outcomes—a perception that has not been confirmed by the clinical data.

78.     It is against this background—a highly active patient population and significant competition at hospitals to attract more patients to the *da Vinci* System to compensate for its cost —that Intuitive used its Surgeon Locator program to induce surgeons to perform more surgeries using the *da Vinci* System, including by "converting" surgeries scheduled to be performed using traditional techniques to surgeries performed using the more expensive *da Vinci* System.

79.     Indeed, Intuitive developed aggressive internal programs to drive sales of *da Vinci* Systems and to maximize the number of robotic surgeries. For example, Intuitive implemented Project 900. A central goal of Project 900 was to drive surgery conversions, i.e., the term used by Intuitive to describe the process whereby an Intuitive sales representative would reach out to surgeons and convince them to convert an already scheduled open or laparoscopic surgery to a more expensive *da Vinci* System robotic surgery in order to increase *da Vinci* System case volume. Intuitive's managers would set weekly and monthly conversion goals for each of its Clinical Sales Representatives and then would monitor progress toward those goals. As a result, in some cases, Intuitive sales representatives would request access to a surgeon's schedule in order to identify scheduled surgeries that could be converted to *da Vinci* System surgeries.

80.     Intuitive used its "Surgeon Locator," which Intuitive marketed to hospitals and surgeons as a powerful tool to increase their revenues, as a carrot to drive these conversions.

81.     For example, in an Intuitive webinar directed toward hospitals and surgeons marketing their da *Vinci* Systems, Intuitive "[e]xplain[ed] the value and process of getting a listing on our surgeon locator." Characterizing the Surgeon Locator as "Online Marketing,"

Intuitive pointed out that "Web Traffic = Procedures" and that "1.5 million visited *da Vinci* websites in 2009, resulting in 13,500 *da Vinci* surgical procedures."

82.     Intuitive also described the marketing efforts (and expense) it had taken to drive consumers to its Surgeon Locator program—explaining: "We've used Search engine optimization (symptoms, conditions and treatments) to generate organic branded traffic. We've also driven traffic from Search Engine marketing (SEM) keyword ad buys[.] If a patient comes through the dVS.com properties they are 3x more likely to choose dVS than if they come in from another channel."

83.     Emphasizing to hospitals and surgeons the monetary benefit they would realize if they were included on the Surgeon Locator, Intuitive even directed them to "identify someone in their practice to monitor their practice email inbox" because "[a] significant number of inquiries come via web referrals[.]" Intuitive emphasized: "We know from our metrics that our surgeon locator function can be a powerful tool to drive patient traffic directly to doctors['] offices…."

84.     In a marketing pamphlet directed to surgeons and hospitals, Intuitive again emphasized the power of the Surgeon Locator, noting that it "already has a comprehensive plan in place to raise awareness of da Vinci surgery on search engines":

> Intuitive Surgical wants to make it easy for potential patients to find and connect with physicians trained on the *da Vinci* Surgical System. Each month, daVinciSurgery.com's "Surgeon Locator" redirects over 1,500 potential patients to the physicians and hospitals listed. When listed on davinciSurgery.com, physicians, practices and hospitals are also automatically listed on all of Intuitive Surgical's sites, including IntuitiveSurgical.com, daVinciProstacetomy.com (Urologists) and daVinciHysterectomy.com (Gynecologists). Patients can search for physicians by country, state, zip/postal code or specialty. All patient inquires will come directly to the email address you provide 'from' daVinciSurgery.com.

85.     Intuitive also made clear, however, that this "powerful tool" was not something it intended to give freely or even something that could be earned through training or credentialing alone. To the contrary, it was a carrot to be given only to those surgeons who completed at least 20 *da Vinci* System surgeries a year.

86.     Knowing that surgeons saw inclusion on the Surgeon Locator as a significant benefit, Intuitive would dangle the carrot of inclusion on the Surgeon Locator to convince surgeons to convert surgeries. As one Intuitive manager bluntly put it: "As part of your conversion quest, look at those surgeons that are close to achieving surgeon locator status. We have seen the power of patients doing their due diligence and seeking out da Vinci surgeons on our web-site."

87.     Intuitive Clinical Sales Representatives also would remind surgeons that each conversion will get them one step closer to the 20 surgery requirement for being included in the Surgeon Locator—telling them:

- "Dr. [REDACTED], To put you one case closer to that 20th case point is there a chance you can convert the TAH, BSO on Wednesday, Sept 1st?"

- "Dr. [REDACTED], You are about as close as you can be to the 20th case point. If you can add 1 or 2 cases of some sort in June I think I can get you on the July Surgeon Locator update."

- "Dr. [REDACTED], It looks like you are two cases short of making the required case volume to make the July update for the Surgeon Locator.  With the vacations coming up there should be plenty of robotic time to squeeze those two cases into the June Calendar.  1.5 million visited *da Vinci* websites in 2009, resulting in 13,500 *da Vinci* surgical procedures[.] Every Week 29,000 Visitors[.]"

- "Follow-up with Dr. [REDACTED] and make sure she followed through with her comitment (sic) to be on the Surgeon Locator."

88.   Intuitive managers also would remind Intuitive Clinical Sales Representatives, "Have you scrubbed your surgeons' schedules to find the necessary cases to put them on the surgeon locator?"

89.   Enticing surgeons with inclusion on the Surgeon Locator was an effective marketing tool for Intuitive to drive robotic surgeries. For example, as one Clinical Sales Representative reported to his manager concerning a cardiac surgeon: "I reminded him of his goal to get back on the surgeon locator. The next day he book[ed] two cases both for this week! He is hoping to get one more before the end of the quarter."

90.   Intuitive managers coached their team of sales representatives. For example, one manager said: "Be proactive in finding cases to convert. Be prepared to challenge each trained surgeon every time you see a lap or open case. Be unsatisfied with the thought of ending a day without a converted case." He also reminded representatives of their conversion goals: "If you are currently under your goal of 10 – how are you going to catch up this week?"

91.   Intuitive managers also were quick to praise sales representatives who secured conversions. For example, when hearing that two sales representatives "converted three cases today for later this week," the manager responded, "That's how you drive the business!" And another manager responded, "Let's all keep driving the business!"

92.   Intuitive managers also turned conversions into a competition among sales representatives. After hearing about a large number of conversions from one sales representative, a manager replied to the entire sales team saying that the sales representative "is setting the bar

HIGH!!!!!" Intuitive Managers also would instruct sales representatives to "keep pushing" to meet their conversion goals.

93.     In addition, Intuitive also used the Surgeon Locator as a stick. No matter how much training or credentialing a surgeon had or how many surgeries he or she previously had performed, Intuitive would threaten to remove him or her from the Surgeon Locator if they did not perform a minimum of 20 *da Vinci System* surgeries each year—depriving them of that valuable benefit.

94.     The unusually high degree of patient involvement as a result of Intuitive's direct-to-consumer marketing renders the Surgeon Locator tool an especially potent tool for doctors to market their practices. The value of being included in the Surgeon Locator is apparent.   But Intuitive makes it clear in its marketing document to surgeons. Indeed, in a piece of marketing Intuitive sales representatives provided to doctors, Intuitive characterizes the *da Vinci* Surgeon Locator as a "simple but powerful tool for marketing your practice." It notes that 21,500 people per week visit a *da Vinci* website and "[w]ith traffic to *da Vinci* properties up by more than 53% in the past 12 months, the *da Vinci* Surgeon Locator is something you'll want to be part of." But Intuitive's offer of this "powerful [marketing] tool" to doctors comes at a cost.

95.     The primary criteria for listing on the *da Vinci* Surgeon locator is that a surgeon must have completed 20 procedures using the System *and* must continue to perform at least 20 procedures every year in order to stay on the Surgeon Locator. In other words, in return for performing 20 surgeries, the surgeons are given advertising for free. This advertising is a significant benefit worth a lot of money and is no different than Intuitive providing a kick-back in cash that the surgeons then use to purchase their own advertising. But in many ways, the

Surgeon Locator kickback is even worse than providing a cash kickback because the only way to gain access to the Surgeon Locator is to perform the 20 surgeries.

96.    Every page at the www.davincisurgery.com website includes a box that allows patients to access the Surgeon Locator.   Below is an example from the "Cardiac Conditions" page:



http://www.davincisurgery.com/da-vinci-cardiac/ [last visited June 28, 2017].

97.    Intuitive pays to advertise both the www.davincisurgery.com website and the Surgeon Locator.   For example, a Google search for the term "robotic surgery" returns the Surgeon Locator as a paid advertisement at the very top of the search results:



https://www.google.com/#q=robotic+surgery [last visited June 28, 2017].

98.   Even Intuitive's marketing videos on the Internet highlight the Surgeon Locator. For example, the below snapshot of an Intuitive marketing video directed at consumers displays a red box directing patients to the Surgeon Locator that remains visible during the video:



https://www.youtube.com/watch?v=h9xwznjCB7Q [last visited June 28, 2017].

99.     Intuitive does not disclose that the Surgeon Locator lists only those surgeons who perform at least twenty surgeries per year.  In fact, it misleadingly suggests the opposite.  At the bottom of the *da Vinci* Surgery website is a link to "Surgeon List."  Clicking on that link opens the page with the Surgeon Locator, which invites the user to "Find a da Vinci Surgeon."  It fails to disclose that many other surgeons are also certified to use the *da Vinci* System who are not included in the Surgeon Locator.  Indeed, a patient might question a doctor's claim to be certified to perform surgeries using the *da Vinci* System if he or she is not listed in the Surgeon Locator.

100.     The Surgeon Locator does more than simply list the names of surgeons.  It also includes other valuable benefits for free such as a "Surgeon Profile" that provides important information such as the procedures performed by the doctor, contact information, directions, and a link to the doctor's website.  Below is an example for a surgeon located in New York City:



http://davincisurgeonlocator.com/surgeoninfo.htm?language=eng&param=40.7127837/-

74.00594130000002/72362/S/20/SurgeonsOnly/all/all/1/no/distance/0/0/new_york,_ny/eng/other

[last visited June 28, 2017].

101.    The Surgeon Locator even provides an online form to make it easy for the patient

to contact the surgeons on the Surgeon Locator:



http://davincisurgeonlocator.com/surgeoninfo.htm?language=eng&param=40.7127837/-

74.00594130000002/72362/S/20/SurgeonsOnly/all/all/1/no/distance/0/0/new_york,_ny/eng/other

[last visited June 28, 2017].

102.    Intuitive states that the twenty surgery per year requirement is "[t]o ensure that

patients receive the highest standard of care." But that statement is belied by Intuitive's actual

policies and practices directed to ensuring that the surgeons who use the *da Vinci* System are

qualified—policies that have been widely criticized and the subject of lawsuits.

103.    First, Intuitive emphasizes elsewhere that credentialing and training requirements are set by hospitals, not by Intuitive. Anyone performing surgery on the *da Vinci* System must be qualified under the associated hospital's credentialing requirement and are, presumably, competent to perform the surgeries. Moreover, despite Intuitive's efforts to distance itself from credentialing requirements, Intuitive sales associates have, in fact, urged hospitals to lower the number of surgeries required before the surgeon is considered qualified to perform surgeries without supervision. These numbers are generally five or fewer. Intuitive's standard for listing on the Surgeon Locator is much higher, in terms of number of surgeries required, and is entirely unrelated to other indications of quality, such as data regarding outcomes. This undermines the assertion that the 20 surgery per year requirement is not a quality assurance tool. And the Surgeon Locator is not even mentioned on Intuitive's webpage devoted to *da Vinci* training.[4]

104.    Nor is it plausible that the primary rationale for the Surgeon Locator is to ensure that patients have access to an index of surgeons in their geographic area that are qualified to perform surgeries on the *da Vinci* System. If it were, then Intuitive should list *all* surgeons who are qualified under a hospital's credentialing requirements to use the *da Vinci* System. Instead they only list surgeons who perform a certain number of surgeries per year using Intuitive's devices.

105.    Stripped of the implausible quality and availability justifications for the Surgeon Locator, it is clear that the ***primary*** motivation of Intuitive marketing the Surgeon Locator to surgeons is to incentivize them to perform more surgeries on the *da Vinci* System. As result, surgeons are incentivized to use the *da Vinci* System even when it is not medically necessary or optimal in light of a patient's individual profile.

---

[4] https://www.intuitivesurgical.com/training/ [last visited June 20, 2017].

106.    Moreover, even *if* quality assurance or patient information were factors in Intuitive's decision to offer the Surgeon Locator, it is clear from Intuitive's own language pitching the Surgeon Locator as a "powerful tool for marketing" surgeons' practice that, at a *minimum,* one motive was to encourage surgeons to perform at least 20 surgeries a year on the *da Vinci* System, in exchange for the benefit of being listed on the Surgeon Locator.

107.    Intuitive is well aware that Medicare, Medicaid, TRICARE, FEHBP, and other government program beneficiaries represent a significant percentage of surgery patients. Indeed, Intuitive has disclosed in its public filings with the Securities and Exchange Commission that if governmental policies do not cover surgical procedures performed using the *da Vinci* System, Intuitive may not be able to generate the revenues necessary to support its business.

108.    Based on this knowledge, Intuitive also knows that as a result of the kickbacks, doctors across the country have performed surgeries on Medicare, Medicaid, TRICARE, FEHBP, and other government program beneficiaries using the *da Vinci* System and sought reimbursement for those surgeries. Intuitive knowingly caused doctors and hospitals to submit hundreds of millions of dollars in false claims to publicly-funded health care programs for medical procedures that were performed using the more costly and risk-associated *da Vinci* System devices.

109.    Intuitive even trained its sales representatives to emphasize the Surgeon Locator during a surgeon's initial "test drive" of the *da Vinci* system—encouraging them to provide the surgeon with an exact day by when they could anticipate to be listed on the Surgeon Locator.

### COUNT ONE
### (Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*)

110.    This is a civil action by Plaintiff Michael Rose, acting on behalf of and in the name of the United States, against the Defendants under the False Claims Act.

111.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

112.    Defendant knowingly has presented or caused to be presented false or fraudulent claims for payment by the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

113.    The Defendant knowingly has made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

114.    Defendant has conspired with others, to defraud the Government by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(1)(C).

115.    Because of the Defendants' conduct set forth in this Count, the United States has suffered actual damages in the hundreds of millions of dollars, with the exact amount to be determined at trial.

### COUNT TWO
**(Alaska Medical Assistance False Claim & Reporting Act, Alaska Stat. Ann, § 09.58.010 *et seq.*)**

116.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

117.    Based on the foregoing allegations, the Defendants are liable under the Alaska Medical Assistance False Claim & Reporting Act, Alaska Stat. Ann, § 09.58.010 *et seq.*

### COUNT THREE
**(California False Claims Act, Cal. Gov. Code §§ 12650 *et seq.*)**

118.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

119.    Based on the foregoing allegations, the Defendant is liable under the California False Claims Act, Cal. Gov. Code §§ 12650 *et seq.*

## COUNT FOUR
### (Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-304 *et seq.*)

120.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

121.    Based on the foregoing allegations, the Defendant is liable under the Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.4 *et seq.*

## COUNT FIVE
### (Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 *et seq.*)

122.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

123.    Based on the foregoing allegations, the Defendant is liable under the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 *et seq.*, including as previously codified at Conn. Gen. Stat. §§ 17b-301b *et seq.*

## COUNT SIX
### (Delaware False Claims & Reporting Act, 6 Del. C. Ann. §§ 1201 *et seq.*)

124.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

125.    Based on the foregoing allegations, the Defendant is liable under the Delaware False Claims & Reporting Act, 6 Del. C. Ann. §§ 1201 *et seq.*

## COUNT SEVEN
### (District of Columbia Medicaid Fraud & Recovery Act, D.C. Code §§ 2-381.01 *et seq.*)

126.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

127.    Based on the foregoing allegations, the Defendant is liable under the District of Columbia Medicaid Fraud & Recovery Act, D.C. Code §§ 2-381.01 *et seq.*, including as

previously codified at D.C. Code §§ 2-308.13 *et seq.*

## COUNT EIGHT
### (Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*)

128.   Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

129.   Based on the foregoing allegations, the Defendant is liable under the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*

## COUNT NINE
### (Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*)

130.   Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

131.   Based on the foregoing allegations, the Defendant is liable under the Georgia State False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*

## COUNT TEN
### (Hawaii False Claims Law, Haw. Rev. Stat. §§ 661-21 *et seq.*)

132.   Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

133.   Based on the foregoing allegations, the Defendant is liable under the Hawaii False Claims Law, Haw. Rev. Stat. §§ 661-21 *et seq.*

## COUNT ELEVEN
### (Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*)

134.   Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

135.   Based on the foregoing allegations, the Defendant is liable under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*

## COUNT TWELVE
**(Indiana False Claims & Whistleblower Protection Act, Ind. Code §§ 5-11-5.5.-1 *et seq.*)**

136.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

137.     Based on the foregoing allegations, the Defendant is liable under the Indiana False Claims & Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*

## COUNT THIRTEEN
**(Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*)**

138.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

139.     Based on the foregoing allegations, the Defendant is liable under the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*

## COUNT FOURTEEN
**(Louisiana Medical Assistance Programs Integrity Law, La. Stat. Ann. §§ 46:437:1 *et seq.*)**

140.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

141.     Based on the foregoing allegations, the Defendant is liable under the Louisiana Medical Assistance Programs Integrity Law, La. Stat. Ann. §§ 46:437:1 *et seq.*

## COUNT FIFTEEN
**(Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 *et seq.*)**

142.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

143.     Based on the foregoing allegations, the Defendant is liable under the Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 *et seq.*

### COUNT SIXTEEN
**(Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, §§ 5A *et seq.*)**

144.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

145.     Based on the foregoing allegations, the Defendant is liable under the Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, §§ 5A *et seq.*

### COUNT SEVENTEEN
**(Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*)**

146.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

147.     Based on the foregoing allegations, the Defendant is liable under the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*

### COUNT EIGHTEEN
**(Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*)**

148.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

149.     Based on the foregoing allegations, the Defendant is liable under the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*

### COUNT NINETEEN
**(Montana False Claims Act, Mon. Code Ann. §§ 17-8-401 *et seq.*)**

150.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

151.     Based on the foregoing allegations, the Defendant is liable under the Montana False Claims Act, Mon. Code Anno. §§ 17-8-401 *et seq.*

## COUNT TWENTY
### (Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010 *et seq.*)

152.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

153.     Based on the foregoing allegations, the Defendant is liable under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010 *et seq.*

## COUNT TWENTY-ONE
### (New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*)

154.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

155.     Based on the foregoing allegations, the Defendant is liable under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*

## COUNT TWENTY-TWO
### (New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*)

156.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

157.     Based on the foregoing allegations, the Defendant is liable under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*

## COUNT TWENTY-THREE
### (New York False Claims Act, N.Y. State Fin. Law §§ 187 (McKinney) *et seq.*)

158.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

159.     Based on the foregoing allegations, the Defendant is liable under the New

York False Claims Act, N.Y. State Fin. Law §§ 187 (McKinney) *et seq.*

## COUNT TWENTY-FOUR
### (North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*)

160.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

161.    Based on the foregoing allegations, the Defendant is liable under the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*

## COUNT TWENTY-FIVE
### (Oklahoma Medicaid False Claims Act, 63 Okla. St. §§ 5053 *et seq.*)

162.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

163.    Based on the foregoing allegations, the Defendant is liable under the Oklahoma Medicaid False Claims Act, 63 Okla. St. §§ 5053 *et seq.*

## COUNT TWENTY-SIX
### (Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*)

164.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

165.    Based on the foregoing allegations, the Defendant is liable under the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*

## COUNT TWENTY-SEVEN
### (Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.*, and
### Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*)

166.    Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

167.    Based on the foregoing allegations, the Defendant is liable under the

Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.*, and Tennessee Medicaid

False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*

### COUNT TWENTY-EIGHT
**(Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*)**

168.    Relator re-alleges and incorporates by reference each preceding paragraph as

though fully set forth herein.

169.    Based on the foregoing allegations, the Defendant is liable under the Texas

Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*

### COUNT TWENTY-NINE
**(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)**

170.    Relator re-alleges and incorporates by reference each preceding paragraph as

though fully set forth herein.

171.    Based on the foregoing allegations, the Defendant is liable under the

Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

### COUNT THIRTY
**(Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*)**

172.    Relator re-alleges and incorporates by reference each preceding paragraph as

though fully set forth herein.

173.    Based on the foregoing allegations, the Defendant is liable under the

Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 et seq.

### COUNT THIRTY-ONE
**(Washington Health Care False Claim Act, Wash. Rev. Code Ann. §§ 48.80.010 *et seq.*, and Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. §§ 74.66.005 *et seq.*)**

174.    Relator re-alleges and incorporates by reference each preceding paragraph as

though fully set forth herein.

175.     Based on the foregoing allegations, the Defendant is liable under the Washington Health Care False Claim Act, Wash. Rev. Code Ann. §§ 48.80.010 *et seq.*, and Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. §§ 74.66.005 *et seq.*

## COUNT THIRTY-TWO
### (Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931 *et seq.*)

176.     Relator re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

177.     Based on the foregoing allegations, the Defendant is liable under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931 *et seq.*, and Wis. Stat. § 990.04 for acts it took prior to July 14, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Rose prays for the following relief:

A.     On Counts One through Thirty-Two, judgment for the United States or identified State Plaintiff, as applicable, against Defendant in an amount equal to three times the damages the federal or state plaintiff government, respectively, has sustained because of the Defendant's actions, plus a civil penalty of at least $11,000 for each violation (or such other maximum amount as may be provided by law), plus any civil penalties available under other applicable federal or state law;

B.     On Counts One through Thirty-Two, an award to the Relator of the maximum allowed under the federal or state law under which suit is brought by the Relator on behalf of the United States or State Plaintiff, respectively;

C.     Against the Defendant, attorneys' fees, expenses and costs of suit; and

D.     Such other and further relief as this Court deems just and proper.

DATED this 30th day of June, 2017

                William Christopher Carmody (WC8478)
                Arun Subramanian (AS2096)
                SUSMAN GODFREY L.L.P.
                1301 Avenue of the Americas, 32nd Floor
                New York, NY 10019
                Telephone: (212) 336-3330
                Facsimile: (212) 336-8340
                bcarmody@susmangodfrey.com
                asubramanian@susmangodfrey.com

                Matthew R. Berry (WA State Bar No.: 37364)
                SUSMAN GODFREY L.L.P.
                1201 Third Avenue, Suite 3800
                Seattle, WA 98101
                Telephone: (206) 516-3880
                Facsimile: (206) 516-3883
                Email: mberry@susmangodfrey.com

                *Counsel for Relator*